## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

Patricia Berardi, Robert Chriswell, Alice Rose   )
Mary Ortiz, Austin Calloway, Ellen Sunderland,   )
and  █████████ as the parent and next friend of  )
█████████████ a minor child, individually on  )
behalf of themselves and all other persons   )
similarly situated,   )
  )
         Plaintiffs,   )
  )
     v.   )
  )
City of Pekin, Illinois, a municipal corporation;  )
Mark Rothert, not individually, but in his official  )
capacity as the Pekin City Manager; John   )
McCabe, John P. Abel, Michael Garrison, Mark  )
Luft, Lloyd Orrick, Michael Ritchason and Jim  )
Schramm, not individually, but in their official  )
capacities as Council Members for the City of  )
Pekin,   )
  )
         Defendants.   )

Case No. 1:18-cv-01438

Jury Trial Requested

## COMPLAINT

Plaintiffs Patricia Berardi, Robert Chriswell, Alice Rose Mary Ortiz, Austin Calloway,

Ellen Sunderland, and █████████ as the parent and next friend of █████████, a minor child

(sometimes collectively referred to herein as "Named Plaintiffs"), individually on behalf of

themselves and all other persons similarly situated, by their attorneys, Jennifer M. Sender, Andrés

J. Gallegos and Richard Lee Stavins, of Robbins Salomon & Patt, Ltd., and Carl F. Reardon,

complain of Defendant City of Pekin, an Illinois municipal corporation, as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the

Named Plaintiffs' claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*
Declaratory relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and FED. R. CIV. P. 57.
Injunctive relief is authorized by FED. R. CIV. P. 65.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendants reside
in this district and all the events or omissions giving rise to claims occurred in this district.

## THE PARTIES

3.      Plaintiff Patricia Berardi ("Ms. Berardi") is a 70-year old female who has been
living with the effects of cancer, resulting in problems ambulating, requiring the use of a cane,
walker and, for distances, a wheelchair or scooter. She is a "qualified person with a disability"
within the meaning of all applicable statutes. She resides in Pekin, Tazewell County, Illinois.

4.      Plaintiff Robert Chriswell ("Mr. Chriswell") is a 54-year-old male who has been
living with effects of two strokes, resulting in his limited ability to ambulate, requiring his use of
a cane for stability. He is a "qualified person with a disability" within the meaning of all applicable
statutes. He resides in Pekin, Tazewell County, Illinois.

5.      Plaintiff Alice Ortiz ("Ms. Ortiz") is a 55-year-old female who has multiple
conditions and infirmities, including Charcot joint disease, affecting her ability to bear weight and
ambulate, requiring the use of a scooter. She is a "qualified person with a disability" within the
meaning of all applicable statutes.  She resides in Pekin, Tazewell County, Illinois.

6.      Plaintiff Austin Calloway ("Mr. Calloway") is a 60-year-old male who has been
living with the effects of a stroke, resulting in partial paralysis and limited vision, requiring the use
of a cane for balance and the use of a power wheelchair. He is a "qualified person with a disability"
within the meaning of all applicable statutes. He resides in Pekin, Tazewell County, Illinois.

7.      Plaintiff Ellen Sunderland ("Ms. Sunderland") is an 89-year old female who has been living with the effects of arthritis, diabetes and other conditions, which limit her gait and affect her balance, requiring the use of a cane and at times a walker. She is a "qualified person with a disability" within the meaning of all applicable statutes. She resides in Pekin, Tazewell County, Illinois.

8.      ███████ is the parent and next friend ██████████████, a 12-year old female who has been living with the effects of fetal alcohol syndrome and other conditions that affect her balance, requiring the use of a walker from time to time. ██████ is a "qualified person with a disability" within the meaning of all applicable statutes. She resides in Pekin, Tazewell County, Illinois.

9.      Defendant City of Pekin ("City") is an Illinois municipal corporation, and is the county seat of Tazewell County in the State of Illinois. With a population of approximately 34,097 (estimate, as of July 1, 2017, U.S. Census Bureau), the City is the largest city in Tazewell County. The City has been and is a public entity within the meaning of Title II of the ADA and has received and does receive federal financial assistance and is therefore a covered entity within the meaning of the Rehabilitation Act. The City is a local governmental entity with the responsibility of providing the Named Plaintiffs, and all other persons with mobility disabilities, with access to its public facilities, programs, services and activities. The City is responsible for constructing, maintaining, repairing, and the regulation of, the system of pedestrian rights-of-way within the City. The City is administered by a council-manager form of government with a seven-person City Council.

10.     Defendant Mark Rothert is the City's City Manager, appointed on or about August 31, 2018. He serves as the chief advisor to the City Council providing it with recommendations

about City operations and services, and he oversees the day-to-day operations of the City supervising all the City's departments. He is sometimes referred to herein as "Mr. Rothert."

11.     Defendants, John McCabe, John P. Abel, Michael Garrison, Mark Luft, Lloyd Orrick, Michael Ritchason and Jim Schramm are members of the City Council. They are each, in their official capacities, legally responsible for ensuring the City's compliance with federal and state law, including the implementation of the City's transition plans. They are sometimes referred to herein, respectively, as "Mr. McCabe," "Mr. Abel," "Mr. Garrison," "Mr. Luft," "Mr. Orrick," "Mr. Ritchason," and "Mr. Schramm." Collectively, they are sometimes referred to herein as the "City Council."

## BACKGROUND FACTS

12.     The City has an expansive pedestrian system that links neighborhoods, recreational resources, government facilities, retail centers and business establishments that, while intended to benefit all residents and visitors, discriminates against persons with mobility disabilities. This lawsuit is brought to redress the Defendants' systemic, pervasive and continuing discrimination against the Named Plaintiffs, and persons similarly situated, with mobility disabilities, through the denial of meaningful access to those neighborhoods, recreational resources, government facilities, retail centers and business establishments through its pedestrian system. The City's curb ramps, sidewalks, school crosswalks, public crosswalks, bus stops, pedestrian crossings and other walkways (hereafter, "pedestrian rights-of-way") are largely inaccessible to persons with mobility disabilities. As alleged herein, the City has failed and continues to fail to construct or maintain pedestrian rights-of-way throughout the City, and it fails to install and maintain curb ramps that are necessary to make its pedestrian rights-of-way readily accessible to persons with mobility disabilities.

13.     The City's pedestrian rights-of-way, when viewed in their entirety, are not readily accessible to and usable by persons with mobility disabilities due to the pervasive existence of numerous architectural and other physical access barriers along the path of travel. The City has, or has caused to be constructed, and has failed, or has caused to fail to eliminate these barriers. A substantial number of the City's sidewalks are in disrepair. A substantial number of street crossings within the City's pedestrian rights-of-way do not comply with applicable federal regulations addressing accessibility for people with disabilities because, for example, they lack curb ramps entirely, have curb ramps only on one side of a corner, have curb ramps that are too steep or too cracked, broken or uplifted to be used safely by people with mobility disabilities. A substantial number of the City's sidewalks in and around its business district that utilize brick pavers have settled to dangerous out of plane conditions, creating tripping hazards. A substantial number of the City's sidewalks, primarily in and around the business district and in newly constructed subdivisions, have light poles or mailbox posts permanently embedded in sidewalks without providing required paths of travel for persons with mobility disabilities utilizing mobility devices such as wheelchairs and scooters.

14.     The City's pedestrian rights-of-way are a fundamental public program, service, and activity that the City provides for the benefit of its residents and visitors. Named Plaintiffs, and other persons similarly situated with mobility disabilities, must choose between remaining segregated from significant amounts of daily activities, including visiting public facilities, places of public accommodation, and friends, and thereby remaining safe, or risking injury or death by traveling on or around inaccessible pedestrian rights-of-way, in busy streets or down alleyways, alongside automobiles and other vehicles. Lack of access to the City's system of pedestrian rights-of-way deprives people with mobility disabilities of their independence, and essentially relegates

them to second-class citizen status. This problem is exacerbated as there are no accessible taxis in the City, and its contracted paratransit service, CityLift, only provides service during the weekdays, from 6:45 a.m. to 5:40 p.m., with no weekend or evening service.

15.    During winter the City's sidewalks become greater hazards to the Named Plaintiffs and all other persons similarly situated with mobility disabilities, as a great number of the curb cuts are difficult to find when buried in snow, and the uneven sidewalks, deteriorated concrete, raised sidewalk panels and all other defects in the sidewalks become undetectable when they are covered in snow. Moreover, many of the City's sidewalks become unnavigable for the Named Plaintiffs and all other persons similarly situated with mobility disabilities as the City does not include reasonable snow removal efforts in its maintenance obligations.

16.    The discrimination and denial of meaningful access to the City's pedestrian rights-of-way for persons with mobility disabilities complained of herein is the direct result of the City's policies and practices regarding the pedestrian rights-of-way and disability access, including but not limited to the failure to:

    a.    Adopt a transition plan that contains specific planning efforts and a reasonable schedule to comply with its requirements under the Americans with Disabilities Act (the "ADA"), and the Rehabilitation Act of 1973 (the "Rehabilitation Act");

    b.    Install curb ramps at intersections in the City that are necessary to provide meaningful access to pedestrian rights-of-way;

    c.    Develop and implement a process for comprehensively and accurately identifying intersections throughout the City at which curb ramps are necessary to provide meaningful access to pedestrian rights-of-way;

    d.    Install accessible curb ramps at locations where no curb ramps exist, or where inaccessible curb ramps exist, within the time required by applicable state and federal disability access laws or on any other reasonable schedule;

    e.    Install accessible curb ramps within the time permitted by statute or within any other reasonable timeframe, after receiving a request to do so or otherwise being notified of the need for a curb ramp at a particular location;

f.  Ensure the repair or elimination of barriers to access on City sidewalks or other pedestrian rights-of-way in the form of broken, cracked, crumbled, steep, sunken, uneven or otherwise inaccessible surfaces, as well as obstacles placed in paths of travel, such as oversized planters, light poles, and mailbox posts, when necessary to provide meaningful access to pedestrian rights-of-way; and

g.  Adopt or implement any policy or practice for inspecting, repairing and maintaining pedestrian rights-of-way free from barriers to access.

17.  The aforesaid policies and practices, and the lack thereof, have resulted in discrimination against persons with mobility disabilities in the form of denial of access to the City's pedestrian rights-of-way that manifest in common ways throughout the City. Nearly 90% of the City's hundreds of miles of pedestrian rights-of-way need repair or are not accessible to persons with mobility disabilities for the absence of curb ramps or compliant curb ramps, even though the City received over $6.5 million dollars in federal funds for such improvements between 2003 and 2018.

18.  The City had a 20-year plan in 1995 to install curb ramps at 898 locations throughout the City by 2015, but that did not occur. As alleged further below, only approximately 198 of approximately 1,500 sidewalks (9%) have what the City itself deems as "compliant" curb ramps.

19.  Accessibility of pedestrian rights-of-way goes to the heart of the purpose of the ADA, the Rehabilitation Act, and other disability rights laws. This lawsuit seeks to force the City to comply with these laws and finally, after nearly 30 years since the enactment of the ADA and nearly 50 years since the enactment of the Rehabilitation Act, to provide access to pedestrian rights-of-way for all residents.

## CLASS ALLEGATIONS

20.  Pursuant to FED. R. CIV. P. 23(a), Named Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. Named Plaintiffs seek to represent a class composed of all persons with mobility disabilities who reside in the City, and who have been denied access, based on their disability, to the pedestrian rights-of-way in the City, within the past two years from the date of the filing of this lawsuit.

21.  Each member of the proposed class is a "qualified person with a disability" and/or a person with a "disability" pursuant to 42 U.S.C. § 12131(2) and 29 U.S.C. § 794(a).

22.  Whether a person is a member of the class can be readily ascertained from certain of the City's own records, including, but not limited to records of the Housing Authority of the City of Pekin ("Housing Authority"), which administers the City's low-income housing program. A significant number of the members of the putative class reside in one of the City's low-income properties - Broadway Apartments, Golden Arms Apartments, and Park Ridge Estates. Each resident of those properties is required to complete the Housing Authority's application, which includes specific provisions for those applicants to request reasonable accommodations based upon disability with a disclosure for the accommodation required related to a disability.

23.  The persons in the class are so numerous that joinder of all persons is impracticable and the disposition of their claims in a class action, rather than in individual actions, will benefit the parties and the Court. Named Plaintiffs are informed and believe that the class consists of well over forty persons and likely one hundred persons or more with mobility disabilities. to wit: the City's low-income housing property ███████████████, which according to its website is "dedicated to our elderly and disabled residents," has 46 apartments, and the ███████████ ████████, a Section 8 high-rise for seniors and persons with disabilities, has 160 units.

24.     As identified below, there are common questions of law and fact involved that affect the parties to be represented in that they are all being denied, or will be denied, their civil rights of full and equal enjoyment of the City's pedestrian rights-of-way due to the general policy and practices of the Defendants, as described herein, which is the focus of this litigation.

25.     Defendants' discriminatory conduct is not unique to the Named Plaintiffs. The claims of Named Plaintiffs are typical of the claims of the class, because Named Plaintiffs are similarly affected by the same course of conduct, namely Defendants' failure to provide and maintain accessible pedestrian rights-of-way.

26.     Named Plaintiffs are adequate class representatives, because each of them has been directly impacted by Defendants' failure to provide and maintain accessible pedestrian rights-of-way. The interests of the Named Plaintiffs are not antagonistic to or otherwise in conflict with the interests of the class as a whole. The attorneys representing the class are experienced in representing clients in class actions and class action civil rights claims.

27.     Class certification is appropriate under FED. R. CIV. P. 23(b)(2), because Defendants have acted and/or failed to act on grounds applicable to the class as a whole, making final declaratory and injunctive relief for the class as a whole superior to all other methods of disposition.

28.     Class certification is appropriate under FED. R. CIV. P. 23(b)(3), because questions of law and fact common to class members predominate over other available methods for the fair and efficient adjudication of this litigation. Common questions of fact and law include, but are not limited to the following:

a.      Whether Defendants are violating Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* by failing to make their programs, services and activities accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility disabilities as set forth herein;

b.      Whether Defendants are violating Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* by failing to make their programs, services and activities accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility disabilities as set forth herein;

c.      Whether Defendants have performed or have caused to be performed "new construction" and/or "alterations" to the City's pedestrian rights-of-way within the meaning of 28 C.F.R. § 35.151, triggering an obligation to construct or retrofit curb ramps;

d.      Whether Defendants have performed or have caused to be performed "new construction" and/or "alterations" to the City's pedestrian rights-of-way within the meaning of 45 C.F.R. § 84.23, triggering an obligation to construct or retrofit curb ramps;

e.      Whether Defendants, by their acts and omissions alleged herein, have engaged in a pattern or practice of discriminating against Named Plaintiffs and members of the class based on their disabilities in violation of applicable federal laws; and

f.      Whether the injunctive relief sought by the Named Plaintiffs, if implemented, would resolve the claims of the class members.

29.     The interests of members of the class in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute an action because of limited financial resources; and the amounts at stake for individuals, while significant, are relatively small for most or all the class members contrasted with the costs of prosecution.

30.     A class action would be manageable. Individualized litigation presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims that might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## **DEFENDANTS' CONDUCT**

31.    On July 9, 1992, the City unveiled its initial implementation plan (the "Transition

Plan"), to comply with the various requirements of the ADA, which, *inter alia,* identified priorities,

but no specific schedule, for the installation of "handicapped ramps @ intersections." *See* City of

Pekin, Americans with Disabilities Act of 1990 Implementation Plan, July 9, 1992. The Transition

Plan identified three priority categories for the installation of curb ramps. "Top Priority" included

City Hall and other City buildings, library, other governmental (i.e., federal, state, county and

township) offices, Agriculture Extension, recruiting centers, DCFS, hospital, churches, schools

(public and private), parks and City bus stops. "Secondary Priority" included commercial areas

(i.e., Court, Derby and 8th streets), UAW Highrise, Courtplace, Golden Arms, grocery and drug

stores, doctors and dentists, funeral homes, and major employers (i.e., Pekin Insurance, Pekin Mall,

etc.). According to the Transition Plan, priority installations were to occur annually as part of the

City HUD Entitlement funded Public Works Improvements.

32.    In 1995, in its ADA Implementation Plan Update (the "1995 Transition Plan

Update"), the City announced a plan to install curb ramps at 98 locations at all of the City's

intersections along State Highways and projected a 20-year program to install curb ramps at

approximately 800 remaining locations. *See* City of Pekin Americans with Disabilities Act 1995

Transition Plan Update, January 26, 1995. The City then committed $40,000 annually

(construction, engineering and contingencies, estimated, $1,000 per ramp), towards the project

from U.S. Department of Housing and Urban Development and the City's Motor Fuel Tax funding.

Pursuant to that projection, the installation of curb ramps at the 898 locations should have been

completed by 2015.

33.     The City did not further update its Transition Plan until on or about June 2016 when the City Council prepared an update specific to public rights-of-way (the "2016 Transition Plan Update"). The City Council created that update only after being compelled to do so by the U.S. Department of Transportation, Federal Highway Administration ("FHWA"), after a finding by the FHWA that the City violated the ADA and Section 504 of the Rehabilitation Act, because, notwithstanding the Transition Plan and the 1995 Transition Plan Update, it lacked "any planning efforts" to make its facilities in its public rights-of-way accessible to persons with disabilities, and that it "failed to ensure access" for those persons to its public rights-of-way or provide a reasonable curb ramp schedule as required by the ADA. *See* FHWA Letter of Finding for Complaint DOT# 2014-0076, December 18, 2015.

34.     The FHWA required the City to voluntarily remediate its violations by (a) updating its Transition Plan to include public rights-of-way facilities, and provide a schedule with a timeframe for removing barriers found at its public rights-of-way facilities to come in compliance with the ADA's requirements; and (b) providing a reasonable curb ramp schedule and timeframe for when the curb ramps in the public rights-of-way would be installed to meet the ADA's requirements.

35.     The 2016 Transition Plan Update established curb ramp installation location priorities. In order of priority, curb ramps were to be installed at intersections servicing: (a) government or public facilities; (b) arterial roadways or the central business district; (c) areas of high concentration with people with disabilities; (d) collector roads; and (e) other areas (such as residential). It also updated the estimation of the cost to correct potentially noncompliant curb ramps to $2,500 per installation.

36.     In the 2016 Transition Plan Update, the City Council did not provide a specific schedule to address the inaccessibility of its pedestrian rights-of-way. It only undertook to make reasonable efforts to improve accessibility through its annual roadway capital improvement plan and sidewalk replacement program.

37.     The 2016 Transition Plan Update also contained monitoring provisions, whereby the City Council provided a link to the City's Geographical Information Services server at: /MSSQL11GIS.LocalGov.copsa.Default.sde/LocalGov.DBO.FacilitiesStreets/LocalGov.DBO.C urbRamp, for the public to monitor its compliance progress. That link is not now operable, and Named Plaintiffs, on information and belief, allege that the link has not been operable for an extensive amount of time.

38.     The 2016 Transition Plan Update identified 193 sidewalks with no curb ramps; identified 906 curb ramps that are noncompliant; identified 253 curb ramps that are potentially compliant; and deemed 139 curb ramps as being compliant. Accepting that information as accurate, the City identified 593 more sidewalks (a 66.4% increase) than in its initial City-wide inventory. Either the City constructed 593 additional sidewalks since its initial sidewalk inventory conducted in 1995, in which case, it had a legal obligation to ensure those sidewalks were accessible upon their construction, or the 1995 inventory was grossly understated. However, even assuming as true this most recent inventory of sidewalks and the City's compliance self-evaluation, in the 26 years that it was required by the ADA to remediate the structural barriers to its pedestrian rights-of-way, the City achieved compliance with only a meager 9% of all the City's sidewalks. Twenty-two years after its commitment to fix 898 curb ramps and sidewalks, only 139 have been fixed correctly. Without curb ramps, Named Plaintiffs and members of the class cannot access the

City's pedestrian rights-of-way or their intended destinations at all or at a minimum without significant delay, difficulty, or danger.

39.     Many pedestrian rights-of-way are broken, cracked, crumbled, sunken and/or caved concrete, and are therefore due for maintenance. Upon information and belief, the City has no plan to maintain curb ramps or accessible sidewalks after they are built.

40.     Defendants have systemically failed, and are failing, to install and maintain accessible pedestrian rights-of-way in violation of federal law herein cited. As a result of Defendants' policies and practices regarding the City's pedestrian walkways and disability access, the pedestrian rights-of-way are characterized by pervasive disability access problems. Those problems include but are not limited to the following examples:

    a.    Unsafe, noncomplying (slopes too steep, hazardous crossroads, high curb ramp lips) or missing curb ramps;

    b.    Broken pedestrian rights-of-way that are cracked, crumbled, steep, sunken or uneven or that have improper slopes or broken and inaccessible surfaces; and

    c.    Physical barriers on the sidewalk between intersections such as improperly placed light posts, mailbox posts or oversized planters.

41.     As a result of Defendants' policies and practices regarding the City's pedestrian walkways and disability access, large segments of the City's pedestrian rights-of-way do not comply with new construction or alteration accessibility requirements. For example, on information and belief, the City fails to install curb ramps consistently when it resurfaces its streets, or performs a combination of two or more maintenance treatments to its streets, like chip sealing, crack filling and sealing, patching, retrofitting, fog sealing, or conducts other maintenance to its streets. As a result, persons with mobility disabilities have been denied meaningful access to the City's pedestrian rights-of-way, public buildings, parks, transportation, and/or places of public

accommodation either through complete denials of access or through a delay of travel or unsafe conditions.

42.     These systemic failures have caused the City's pedestrian rights-of-way to be inaccessible when viewed in their entirety in violation of federal law.

43.     These barriers are not isolated or limited circumstances. Rather, these barriers are present throughout the City, thus denying access to persons with disabilities city-wide. Persons with mobility disabilities encounter numerous obstacles to using pedestrian rights-of-way throughout the City, including but not limited to the downtown, the Riverfront, and virtually each of the City's neighborhoods. As a result of these barriers, persons with mobility disabilities have been denied access to accommodations or public services. Furthermore, these barriers discourage persons with mobility disabilities from exploring or visiting other areas of the City. These barriers have also delayed travel and cause these persons to fear for their safety, as these conditions often create situations that are downright dangerous for persons with mobility disabilities.

44.     This discrimination and systemic inaccessibility have a severe negative impact on persons with mobility disabilities within the City as represented by the experiences of the Named Plaintiffs.

## EXPERIENCES OF THE NAMED PLAINTIFFS

### *Patricia Berardi*

45.     Ms. Berardi resides in the City's Holiday Hills neighborhood at ████████ ████. She is deterred from strolling in her immediate neighborhood utilizing her walker or scooter because of the unsafe conditions of the sidewalks, missing or broken curb ramps, and other physical barriers. Those conditions and barriers preclude her from utilizing the City's pedestrian

rights-of-way without injury to herself or damage to her scooter. The unsafe conditions and physical barriers include, but are not limited to:

  a.  A fire hydrant obstructing the sidewalk at or near 718 Heisel Avenue, that provides for only 28 inches of clear space on the sidewalk;

  b.  Fire hydrants obstructing the sidewalks on the corner of Heisel Avenue and Florence Avenue, and on the corner of Heisel Avenue and Holiday Drive, both providing for only 30 inches of clear space on the sidewalk;

  c.  At the other end of the sidewalk on her block at the corner of Heisel Avenue and Holiday Drive, there is no curb ramp;

  d.  At 1704 Florence Avenue, the sidewalk is cracked and raised;

  e.  At 1616 Florence Avenue, the sidewalk is cracked and raised horizontally and vertically at one end as much as 4 inches;

  f.  At 2100 Independence Drive, the sidewalk is cracked and raised horizontally and vertically approximately 2.5 inches;

  g.  At the four-corner intersection of Holiday Drive and Independence Drive, at one corner, there is no curb cut and the sidewalk is cracked and raised horizontally and vertically approximately 3 inches; and at one other corner the curb cut is severely sloped, allowing for water to accumulate and pond;

  h.  A long stretch of sidewalk along 2003 Independence Drive is severely cracked, sunken and buckled;

  i.  At the four-corner intersection of Florence Avenue and Independence Drive at one corner there is no curb cut and surface water accumulates and ponds adjacent to the curb; and at another corner a sidewalk panel has sunken and the sidewalk is cracked and raised horizontally and vertically approximately 2 inches;

  j.  At the two-corner intersection of Parish Avenue and Valentine Avenue there are no curb cuts; and

  k.  At one of the two corners at the intersection of Holiday Avenue and Valentine Avenue, the sidewalk at the corner consists of concrete, relatively recently poured tying into asphalt sidewalks, with no curb cut.

  46.  Given Ms. Berardi's functional limitations, she is not able to step down or up curbs or step over raised sidewalks. The aforementioned conditions also are hazardous when she

attempts to utilize her scooter on those sidewalks, as she risks getting stuck or damaging her scooter and sustaining bodily injury.

47.     As a result of the foregoing, Ms. Berardi has been and continues to be denied equal access to her neighborhood and other parts of her community that persons without mobility disabilities enjoy. She is often deterred from navigating the pedestrian rights-of-way in the City, to visit public facilities, places of public accommodation, and friends because she chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

**Robert Chriswell**

48.     For the past nine years Mr. Chriswell has lived at the ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, in the City. The ▮▮▮▮▮▮▮ Apartment complex is a six-story building with 46 units dedicated to elderly and disabled residents. The apartment complex is operated by the City through its City Housing Authority. Although the ▮▮▮▮▮▮ Apartment complex was identified in the City's Transition Plan as among the "Second Priority" remediation category, the sidewalks and curb cuts in and around this apartment complex are hazardous and unsafe.

49.     Mr. Chriswell regularly frequents Busy Corner Restaurant, located at 229 Derby Street in the City, which is approximately 1.1 miles from his apartment complex, and Ernie's Family Restaurant, located at 613 Derby Street, which is approximately 0.8 miles from his apartment complex. He also frequents public accommodations in the City's business district. In his neighborhood, along the way to those restaurants and the business district, he is confronted with many physical barriers on those sidewalks, including, but not limited to:

   a.     Vehicles parked in front of businesses blocking portions or all the sidewalk immediately in front of those businesses.  (The problem is often most severe at 343 Derby Street; and just east of S. Capitol Street and Derby Street);

b.     In the winter, snow pushed onto and obstructing sidewalks and curb cuts;

c.     Sloping and cracked sidewalks along the 600 block of 4th Street;

d.     On the 900 block of 4th Street, the sidewalk is cracked and raised horizontally and vertically approximately 2.5 inches, and in another area approximately 3.25 inches;

e.     Uneven surfaces, sidewalks, and obstructions on Derby Street between 4th Street and Ernie's Family Restaurant; and

f.     On the east corner of Derby Street and 7th Street where Ernie's Family Restaurant is located, there is no curb cut, and in the painted cross walk there is a sewer grate abutting the curb with wide openings that are hazardous to Mr. Chriswell as he utilizes his cane; further, on that curb, there is an oversized flower planter;

50.     In October 2017, when attempting to navigate the sidewalks at the corner on South 4th Street and Charles Street, Mr. Chriswell tripped and sustained bodily injury on the broken raised sidewalk, resulting in medical care, treatment and attention at Pekin Hospital.

51.     As a result of the foregoing, Mr. Chriswell has been and continues to be denied equal access to his neighborhood and other parts of his community that persons without mobility disabilities enjoy. He is often deterred from navigating the pedestrian rights-of-way in the City, to visit public facilities, places of public accommodation, and friends because he chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

### Alice Rose Mary Ortiz

52.     Ms. Ortiz has lived in Pekin all her life. For approximately the last four years, she has lived in the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, a high-rise Section 8 housing complex of 160 units for seniors and persons with disabilities, at ▇▇▇▇▇▇▇▇▇. Despite ▇▇▇▇▇▇ Apartments being identified by the City as in the "Second Priority" remediation category in its Transition Plan, the sidewalks and curb cuts around her apartment complex are hazardous and unsafe.

53.     Ms. Ortiz relies upon the use of the City's pedestrian walkway system, *inter alia,* to obtain her meals and groceries and to frequent different businesses in the City. She often

frequents the Circle K Convenience Store & Gas Station ("Circle K"), located at 111 N. Capitol

Street, which is approximately 0.3 miles from her apartment complex. Utilizing her scooter, she

must attempt to navigate several physical barriers on the City's sidewalk, streets and alleyways,

including and not limited to:

a.   Curb ramps are in poor and unsafe conditions at the four-corner intersection on 3rd Street and Court Street, which is on the corner of the block from her apartment complex;

b.   Cracks, dips and disrepair of the curb cuts and street pavement exist at the intersection of Court and South 2nd Street when attempting to visit the Riverfront. The street pavement abutting the opposite corner curb cut at that intersection has deteriorated and is all dirt;

c.   On 3rd Street between Court Street and Ann Eliza Street, the sidewalks are sloped, cracked, buckled and in certain spots have eroded, leaving a significant gap in the sidewalk and exposing dirt that turns into mud and is unnavigable when it rains;

d.   Sidewalks on Ann Eliza Street, between 3rd Street and N. Capital Street have deteriorated in stretches; and

e.   Large planters and light poles have been installed which obstruct sidewalks along Court Street between her apartment building and her bank, First Pekin Savings Bank, at 532 Court Street.

54.   In June 2018, on 3rd Street between Court Street and Ann Eliza Street on her way

to Circle K, Ms. Ortiz's scooter became stuck in one of those stretches where the sidewalk's

concrete deteriorated, requiring friends to push her through that stretch.

55.   To avoid those sidewalks, Ms. Ortiz often will attempt to get to Circle K and other

locations in the City by riding her scooter on the City's streets alongside cars and other vehicles,

on bike paths, and through alleys at her peril as the alleys are riddled with potholes, which pose a

greater risk in winter when covered by snow.

56.   As a result of the foregoing, Ms. Ortiz has been and continues to be denied equal

access to her neighborhood and other parts of his community that persons without mobility

disabilities enjoy. She is often deterred from navigating the pedestrian rights-of-way in the City, to visit public facilities, places of public accommodation, and friends because she chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

### Austin Calloway

57.     For approximately the last five years, Mr. Calloway has lived in the ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He lives alone, but has the assistance of a personal attendant, Mary Jane Richards, who accompanies him when he leaves his apartment. Mr. Calloway confronts several physical barriers on sidewalks when attempting to access the City's services, including, but not limited to:

a.     Cracks, dips and disrepair of the curb cuts and street pavement at the intersection of Court and South 2nd Street when attempting to visit the Riverfront. The street pavement abutting the opposite corner curb cut at that intersection has deteriorated and is all dirt;

b.     Excessive cross slopes, raised sidewalk panels, and cracked and buckled sidewalks between his apartment complex and his bank, First Pekin Savings Bank, at 532 Court Street, which is approximately 4 blocks from his apartment complex;

c.     Large planters, telephone poles, light poles, garbage cans and fire hydrants obstructing sidewalks along Court Street between his apartment building and that bank;

d.     Cross slope of approximately 5.6% on the sidewalk immediately after crossing those railroad tracks, at the driveway of the Pekin Times parking lot;

e.     Cross slope of approximately 6.4% at the driveway entry into the municipal parking lot near the Tazewell building on Court Street between 4th and 5th Streets;

f.     A myriad of problems, including broken concrete, and a curb ramp with excessive slope of approximately 9.1% on one side of the intersection at the corner of Court Street and 5th Street;

g.     Extreme slopes at driveways, alleys and sidewalks on 5th Street between Court Street and Broadway Street towards the City Public Library and the post office that makes it extremely difficult to attempt to navigate with a mobility aid; and

h. Broken concrete on sidewalks, light poles obstructing sidewalks with little clearing space, holes in sewer grates and excessive sidewalk slopes at the intersection at Margaret Street (State Route 9) and 5th Street.

58. To avoid injury posed by those barriers, Mr. Calloway often tries to avoid them, at great peril to his safety, by walking or utilizing his wheelchair in the City's streets alongside cars and other vehicles, and in the City's alleyways, but the streets and alleys are themselves, are riddled with potholes and pose a greater risk in winter when covered by snow.

59. As a result of the foregoing, Mr. Calloway has been and continues to be denied equal access to his neighborhood and other parts of his community that persons without mobility disabilities enjoy. He is often deterred from navigating the pedestrian rights-of-way in the City, to visit public facilities, places of public accommodation, and friends because he chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

### *Ellen Sunderland*

60. Ms. Sunderland resides in her house in the City at ███████████ where she has lived for the past 64 years. Her house is at the intersection of ████████████. Across the street from her house ██████████ is the First Christian Church of Pekin. Across the street from her house ██████████ is Edison Junior High School.

61. Ms. Sunderland is afraid to leave her house walking because the only curb on the partial sidewalk servicing her house at that intersection is severely broken.

62. For at least the past 10 years, Ms. Sunderland has made multiple requests to the City to repair the curb, but the City has refused and stated it was her responsibility to maintain and repair.

63. Without a safe curb, Ms. Sunderland cannot use the sidewalk and is forced to follow her driveway onto Illinois Street and walk on the street alongside cars and other vehicles at a very busy intersection.

64. As a result of the foregoing, Ms. Sunderland has been and continues to be denied equal access to her neighborhood and other parts of her community that persons without mobility disabilities enjoy. She is often deterred from navigating the pedestrian rights-of-way in the City, to visit public facilities, places of public accommodation, and friends because she chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

██████████

65. ██████████, a minor, resides with her family at ██████████ in the City, where she and her family have lived for approximately one year. Prior to that, the family resided at ██████████. ██████ is one of four children who were fostered and then adopted by ██████. ██████ and her three siblings suffer from the effects of fetal alcohol syndrome and other conditions that affect their balance and mobility.

66. The sidewalks in and around ██████ former house on ██████ had no sidewalks either along ██████████, except for sidewalks servicing the commercial establishments on ██████████, and she was forced to walk in the street alongside automobiles and other vehicles at her peril.

67. At her current house, ██████ must confront sidewalks that are uneven, cracked, sunken and without curb cuts. Some of the barriers she must confront include, but are not limited to:

    a. An extreme cross slope, of approximately 13.1%, on the sidewalk just west of the driveway entrance to her house on ██████████;

b.     No curb cuts at the north and south corner of the sidewalk immediately servicing her house at the intersection of ███████████████████████ ;

c.     A sunken sidewalk panel on the sidewalk just south of the property line of their house on ███████████ revealing a water valve protruding from the sidewalk approximately 2 inches which is often obscured by leaves, and now snow;

d.     A sidewalk that is discontinuous along ██████████ to the south to ██████████ providing no accessible route to a school bus crossing for Willow Primary School;

e.     No accessible route from her house to ███████████ Assembly of God Church and day care center; and

f.     Along Scenic View Court, a quiet cul-de-sac, extreme cross slope of driveways, numerous sidewalks out of plane conditions, severely cracking and damaged sidewalk panels, rising vertically and horizontally as much as 2 inches.

68.     The absence of curb cuts, the sunken sidewalk panels, the protruding sidewalk panels on sidewalks servicing her house on ███████████ and her immediate neighborhood have caused ██████ to trip and fall on numerous occasions sustaining bodily injury. Where there are no sidewalks, ██████ is required to walk on the street at great peril to her safety and well-being.

69.     The foregoing experiences of the Named Plaintiffs are typical of those experienced by people with mobility disabilities in the City and demonstrate the inaccessibility, fear, humiliation and isolation that people with mobility disabilities experience while trying to navigate the City's pedestrian rights-of-way. To avoid the unsafe sidewalks, persons with mobility disabilities use their wheelchairs, scooters or attempt to walk dangerously alongside cars and other vehicles in the City's streets.

## COUNT I

### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.*

70.     Named Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs 1-69.

71.     The ADA was enacted, based upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. §§ 12101(a)(2).

72.     The statute states that the purpose of the ADA is to provide a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1)-(2).

73.     The statue further states that: "[N]o qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. §§ 12132.

74.     At all relevant times herein, the City was and is a public entity within the meaning of Title II of the ADA and provides a program, service, or activity to the general public.

75.     At all relevant times herein, the Named Plaintiffs were and are qualified individuals with disabilities within the meaning of Title II of the ADA, and they met the essential eligibility requirements for the receipt of the services, programs, or activities of the City. 42 U.S.C. §§ 12131.

76.     Defendants are mandated to operate each program, service, or activity "so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § § 35.150, 35.149 & 35.151.

77.     Pedestrian rights-of-way themselves constitute a vital public program, service, or activity under Title II of the ADA. 28 C.F.R. § 35.104; *Everson v. Board of Educ. of Ewing Twp.*, 330 U.S. 1, 17–18, 67 S.Ct. 504, 91 L.Ed. 711 (1947), *Culvahouse v. City of LaPorte,* 676 F.Supp.2d. 931, 939 (2009); *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir.2002).

78.     The regulations implementing Title II of the ADA specifically provide that a public entity must:

a.      Ensure that its existing facilities are accessible to persons with disabilities, and to have a transition plan to ensure access for persons with disabilities to public entity facilities, including a reasonable curb ramp installation schedule and reasonable plans for sidewalks. 28 C.F.R. §§ 35.133(a); 35.149; 35.150(a) & (d).

b.      Update transition plans for public rights-of-way facilities and provide a schedule for curb ramp installations that meet the applicable ADA requirements. 28 C.F.R. § 35.150 (a),(d)(1) & (2).

c.      With respect to existing facilities, including sidewalks, "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. §35.150(a). Compliance with those requirements may be achieved through, among other methods, alteration of existing facilities or construction of new facilities. 28 C.F.R. § 35.150(c). Where structural changes are required to comply, such changes shall be made as expeditiously as possible. *Id.*

d.      Ensure pedestrian facilities, where provided within its jurisdiction, are accessible to persons with disabilities, and accessibility must be provided at the same time that a new or altered facility is constructed and be within the scope of the construction project. 28 C.F.R. §§ 35.149 – 35.151.

e.      Install curb ramps at intersections whenever it newly constructs or alters sidewalks, streets, roads and/or highways at any time after January 26, 1992 and must comply with the Uniform Federal Accessibility Standards (UFAS) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG). 28 C.F.R. § 35.151. A street resurfacing project by a public entity is an alteration under the meaning of the regulation. *Kinney v. Yersalim,* 9 F.3d 1067, 1073-74 (3rd Cir. 1993).

f.      Maintain the features of all facilities required to be accessible by the ADA. 28 C.F.R. § 35.133. Facilities required to be accessible included roads, walks, and passageways. 28 C.F.R. § 35.104.

79.     Notwithstanding its Transition Plan and subsequent updates, the City has violated the ADA with the absence of any planning efforts in 26 years to make its pedestrian rights-of-way accessible to persons with disabilities, in violation of 28 C.F.R. §§ 35.150(a),(d)(1)&(2); and

failing to provide a reasonable curb ramp schedule to make those pedestrian rights-of-way accessible, in violation of 28 C.F.R. §§ 35.133(a); 35.149; and 35.150(a),(d)(1)&(2).

80.     The City's pedestrian rights-of-way are not fully, equally or safely accessible to Named Plaintiffs and members of the class when viewed in their entirety. The pedestrian rights-of-way within the City's jurisdiction include facilities within the meaning of ADA and UFAS. Since January 26, 1992, Defendants have constructed, altered or repaired parts of these facilities within the meaning of the ADAAG, and the UFAS. Through their policies and practices, Defendants have failed to make such facilities readily accessible to and usable by persons with disabilities in violation of 28 C.F.R. § 35.151.

81.     Defendants committed these acts and omissions with deliberate indifference and intentional disregard of the Named Plaintiffs' and the class members' rights.

82.     As a direct and proximate result of the aforementioned acts and omissions, Named Plaintiffs and members of the class have suffered, and continue to suffer a loss of a civil right, humiliation, hardship and anxiety, due to defendants' failure to address accommodations, modifications, services and acts as required for the Named Plaintiffs' disabilities and the class members' disabilities.

83.     Defendants' conduct constitutes ongoing and continuing violations of the ADA. Unless restrained from doing so, Defendants will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries on Named Plaintiffs and the members of the class for which Named Plaintiffs and the class members will have no adequate remedy at law. Therefore, pursuant to 42 U.S.C. § 12133, Named Plaintiffs and members of the class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

# **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs and members of the class pray for the following relief:

a.  An order declaring that Defendants are operating in a manner which discriminates against disabled individuals with mobility disabilities, and that Defendants fail to provide access to pedestrian rights-of-way for persons with mobility disabilities as required by the Title II of the ADA;

b.  A preliminary injunction and a permanent injunction, prohibiting Defendants from violating the ADA, 42 U.S.C. § 12133, *et seq.*, and compelling each Defendant to undertake remedial measures to mitigate the effects of Defendants' past and ongoing violations of Title II of the ADA, and regulations promulgated thereunder. At a minimum, Defendants must be ordered to take the following actions:

  i.  Ensure that the City's pedestrian rights-of-way when viewed in their entirety are readily accessible to and usable by individuals with disabilities;

  ii.  Undertake prompt remedial measures to eliminate the physical barriers to access to pedestrian rights-of-way to make such rights-of-way accessible to Named Plaintiffs and members of the class;

  iii.  Ensure that all future construction and alterations to the City's pedestrian rights-of-way comply with the ADAAG and/or USAF Standards; and

  iv.  Remain under this Court's jurisdiction until Defendants fully comply with the Orders of the Court.

c.  An order certifying the case as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(2) or (b)(3), and appointing Named Plaintiffs as class representatives and their attorneys as class counsel;

d.  The appointment of a monitor to verify the Defendants' compliance with the ordered injunctive relief, reporting the City's progress to the Court and all parties every three months;

e.  An award of Named Plaintiffs' and class members' attorneys' fees and costs;

f.  An award of damages to the Named Plaintiffs and the class members to the extent provided by law; and

g.  Such other relief as the Court deems just.

## COUNT II

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794 *et seq.*

84.     Named Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1-69.

85.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a).

86.     Named Plaintiffs are otherwise qualified to participate in services or activities that are provided to individuals in the City. *See* 29 U.S.C. § 794(b).

87.     The City is a direct recipient of federal financial assistance sufficient to invoke the coverage of 29 U.S.C. § 794 and has received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

88.     Regulations implementing 29 U.S.C. § 794require public entities that receive federal financial assistance to conduct a self-evaluation and create a transition plan by June 3, 1978. 45 C.F.R. § 84.22(e). Similar to the ADA requirements, transition plans under the Rehabilitation Act must include, among other things, an up-to-date schedule for providing curb ramps or other sloped areas where the pedestrian right-of-way crosses streets. 45 C.F.R. § 84.22(e).

89.     Under 29 U.S.C. § 794, a recipient of federal financial assistance must install ADAAG- or USAF-compliant curb ramps at intersections whenever it newly constructed or altered sidewalks, streets, roads, and/or highways at any time after June 3, 1977. *Willits v. City of Los Angeles*, 925 F. Supp. 2d. 1089, 1094 (C.D. Cal. 2013).

90.     Defendants have failed and are failing to prepare and implement a transition plan that is compliant with the requirements of the Rehabilitation Act, in violation of 45 C.F.R. §84.22(e). Defendants, their agents and employees, have violated and continue to violate the Rehabilitation Act and regulations promulgated thereunder by excluding Named Plaintiffs and members of the class from participation in, denying Named Plaintiffs and members of the class the benefits of, and subjecting them, based solely by reason of their disability to discrimination in the benefits and services of the City's pedestrian rights-of-way and for the reasons set forth above.

91.     Defendants have violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to construct or install compliant curb cuts at intersections throughout the City where it has newly constructed or altered streets, roads and/or highways since June 3, 1977.

92.     Defendants committed the acts and omissions alleged herein with intent or with deliberate indifference to Named Plaintiffs' and the class members' rights.

93.     As a direct and proximate result of the aforementioned acts, Named Plaintiffs and members of the class suffered and continue to suffer a loss of civil rights, humiliation, hardship, and anxiety due to the Defendants' failure to address accommodations, modifications, services and acts as required for their disabilities.

94.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

95.     Named Plaintiffs and members of the class are entitled to compensatory damages, reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs and members of the class pray for the following relief:

a.     An order declaring that Defendants are operating in a manner which discriminates against disabled individuals with mobility disabilities, and that Defendant fail to provide access for persons with disabilities as required by Section 504 of the Rehabilitation Act;

b.     A preliminary injunction and a permanent injunction, prohibiting Defendants from violating Section 504 of the Rehabilitation Act, and compelling Defendant to undertake remedial measures to mitigate the effects of Defendants' past and ongoing violations of Section 504 of the Rehabilitation Act, and regulations promulgated thereunder. At a minimum, Defendants must be ordered to take the following actions:

   i.   Ensure that the City's pedestrian rights-of-way when viewed in their entirety are readily accessible to and usable by individuals with mobility disabilities;

   ii.  Undertake prompt remedial measures to eliminate the physical barriers to access to pedestrian rights-of-way to make such rights-of-way accessible to Named Plaintiffs and members of the class;

   iii. Ensure that all future the construction and alterations to City pedestrian rights-of-way comply with all applicable federal standards; and

   iv.  Remain under this Court's jurisdiction until Defendants fully comply with the Orders of the Court.

c.     An order certifying the case as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(2) or (b)(3), and appointing Named Plaintiffs as class representatives and their attorneys as class counsel;

d.     Appointment of a monitor to verify the Defendants' compliance with the ordered injunctive relief, reporting the City's progress to the Court and all parties every three months;

e.     An award of Named Plaintiffs' and class members' attorneys' fees and costs;

f.      An award of damages to the Named Plaintiffs and to the class member to the extent
        provided by law; and

g.      Such other relief as the Court deems just.


                                        Patricia Berardi, Robert Chriswell, Alice Ortiz,
                                        Austin Calloway, Ellen Sunderland, ███
                                        ███ as the parent and next friend of ███
                                        ███ a minor, individually on behalf of
                                        themselves and all other persons similarly
                                        situated, plaintiffs


                        By:     /s/ Jennifer M. Sender
                                One of Their Attorneys


Jennifer M. Sender (ARDC No. 6207774)
Andrés J. Gallegos (ARDC No. 6212168)
Richard Lee Stavins (ARDC No. 2710099)
Attorneys for Plaintiffs
ROBBINS, SALOMON & PATT, LTD.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 - Telephone
(312) 782-6690 - Facsimile
jsender@rsplaw.com
agallegos@rsplaw.com
rstavins@rsplaw.com

Carl F. Reardon (ARDC No. 2295725)
Attorney for Plaintiffs
120 Illini Drive
East Peoria, IL 61611
(309) 699-6767
carlreardon@comcast.net