# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

PATRICIA BERARDI; ROBERT
CHRISWELL; AUSTIN CALLOWAY;
ELLEN SUNDERLAND; LISA LYNCH;
and SUSAN DUVALL, individually and
on behalf of all others similarly situated,

    *Plaintiffs,*

v.

CITY OF PEKIN; MARK ROTHERT;
JOHN MCCABE; JOHN ABEL;
MICHAEL GARRISON; MARK LUFT;
LLOYD ORRICK; MICHAEL
RITCHASON; and JIM SCHRAMM,

    *Defendants.*

Case No. 1:18-cv-01438-RLH

## ORDER & OPINION

Plaintiffs brought this ADA class action against the City of Pekin and several of its officials in December 2018. They alleged that the City had systematically failed to maintain accessible curb ramps, sidewalks, and other pedestrian crossings. (Doc. 1.) After the exchange of discovery, plaintiffs moved to certify a class of all Pekin residents who were denied meaningful access to pedestrian rights of way between December 11, 2016 and December 11, 2018. (Doc. 27.) That class was certified in April 2021. (Doc. 47.) Settlement discussions ensued, and in October 2022 the parties sought the Court's approval of a class-wide settlement. (Doc. 73.) The Court granted that request and entered a consent decree in November 2022. (Doc. 76.)

The consent decree is the focus of the parties' present dispute. It imposes wide-ranging obligations on the City of Pekin—all aimed toward remediating the inaccessible pedestrian rights of way that sparked this lawsuit. First and foremost, the City was required to commission an "Updated Transition Plan," designed to identify all non-compliant pedestrian rights of way. That plan was completed by a third-party engineering firm—TWM[1]—and submitted to the Court in April 2024. (Doc. 80.) Using LiDAR technology, TWM found that seventy-five percent of the City's sidewalks and ninety-five percent of its ramps did not comply with the ADA. (Doc. 80-1 at 2.) It estimated that complete remediation of the City's pedestrian rights of way would cost upwards of sixty-four million dollars. (Doc. 80-1 at 18.)

The City also committed $250,000 towards ADA remediation annually, and an additional $1.5 million in the three years following the consent decree's effective date. (Doc. 73-1 at 27.) The decree implements a monitoring scheme, in which TWM will randomly inspect a specified percentage of the City's remediation work each year to ensure that it complies with the ADA. (*See* Doc. 73-1 at 25–26.) It requires the City to maintain a detailed record of all upgrades, and to submit semi-annual reports to plaintiffs' counsel. (Doc. 73-1 at 32–33.) It requires the City to maintain staff who are trained on the applicable ADA rules and regulations. (Doc. 73-1 at 32.) It requires the City to maintain a system in which residents can lodge complaints about ADA compliance issues. (Doc. 73-1 at 31–32.) And it implements a conflict-resolution

---

[1] TWM was mutually agreed upon by both parties as the "Consultant'" responsible for generating the Updated Transition Plan and monitoring the City's remediation throughout the term of the decree. TWM can only be replaced for good cause. (Doc. 73-1 at 40.)

process that channels disputes between plaintiffs' and the City through an informal process before seeking the Court's intervention. (Doc. 73-1 at 39–40.)

The most notable feature of the decree, however, is what it omits: a termination date. Indeed, it defines the "Term" as "commencing upon the Effective Date and ending upon the date to be established by the Court." (Doc. 73-1 at 17.) In October 2025, plaintiffs filed a "Motion for Determination of Duration of Consent Decree." (Doc. 85.) The Court held a hearing and established a briefing schedule for the parties to submit their positions about an appropriate termination date.

The parties took vastly different positions on whether the City has complied with the consent decree in the four years since it was entered. The City maintained that it has "fully complied with the letter and spirit" of the consent decree. (Doc. 87 at 2.) It attached voluminous documents showing that the City has (1) satisfied—if not exceeded—its financial obligations under the decree; (2) engaged in remediation of priority areas; (3) received positive feedback from TWM, the independent auditor; and (4) complied with the decree's other monitoring and field-verification provisions. (*See* Doc. 87 at 2–4.) For these reasons, the City asked the Court to terminate the consent decree "as soon as reasonably possible." (Doc. 87 at 5.)

Plaintiffs' response told a different story. They alleged that (1) the City has failed to report the current status of the ADA remediation work, including work in priority locations; (2) the City has reported inconsistent financial data; and (3) that the City has failed to comply with a host of other provisions, such as the training of staff, the lack of oversight by TWM, and the lack of clarity in future funding. (*See*

3

*generally* Doc. 92.) Plaintiffs accordingly sought a termination date no sooner than 2040. At the Court's request, the City replied to those accusations, attaching over one thousand pages purporting to show the City's efforts to comply with the decree. Plaintiffs have since moved for (1) the appointment of an independent monitor, (Doc. 99), and (2) an order compelling enforcement of the consent decree, (Doc. 98).

To make sense of the vast amounts of data involved and to bridge the gap between the parties' views, the Court held an evidentiary hearing on August 4, 2026. During the hearing, the parties presented oral argument and elicited testimony from two witnesses: John Dossey, the City's manager; and Joseph Hufnagel, the City's ADA coordinator employed by the public works department.

The parties' opening statements largely mirrored the content of their briefs. Plaintiffs maintained that the City has not satisfied the consent decree's material requirements nor achieved it's remedial objectives. In response, the City insisted that it has substantially complied with the decree's provisions, and asked the Court to terminate the decree at the end of the hearing—or shortly thereafter.

During plaintiffs' examination of Dossey, he spoke to the institutional reform the City has implemented in order to comply with the decree. He testified, for instance, that the finance department maintains quarterly reports of ADA-related expenditures; that the public works department prepares quarterly and annual reports pursuant to the decree's requirements; that the City has maintained its contract with TWM, who regularly inspects the City's remediation work; that the City has several personnel trained in ADA regulations; and that the City's website has

been updated to ensure its progress on ADA remediation is publicly accessible. Similar testimony was elicited during the City's examination. Dossey further testified that the City has implement a five-year "Strategic Plan" in which accessibility was designated the number one priority, as was compliance with the decree. (D's Ex. 11 at 5–6.) He confirmed that the City has implemented an ADA grievance process through an online portal, and that the Illinois Department of Transportation has touted the City's ADA Transition Plan as the gold standard.

Hufnagel—the City's ADA coordinator—also testified. He maintained that his role is to evaluate ADA-related work and send bi-annual reports to TWM for certification. He also takes photographs of the City's remediation work and stores them on the City's computer system. When asked whether he was aware that his ADA certification would expire, Hufnagel said he was not, but that he does continuing education on an as-needed basis. During the City's examination, Hufnagel specified that he was in contact with TWM several times throughout the year—most notably, immediately before and after his reports are due. He testified that TWM's inspections were "random," insofar as he was not present when they took place.

In closing, plaintiffs insisted that the City has not meet its reporting obligations, and that the Court cannot ascertain whether or to what extent the City has complied with the decree. They reiterated their request for a fifteen-year term and suggested that ample precedent supports it. (*See* Doc. 114 (Plaintiffs' Notice of Supplemental Authority).) The City suggested that the circumstances have improved

5

to such a degree that the decree is no longer needed, and that termination is warranted under the applicable legal standard.

## DISCUSSION

The evidence presented in the parties' briefs and elicited at the evidentiary hearing demonstrates that the City has complied with the spirit of the consent decree. Plaintiffs' Motion to Enforce the Consent Decree will therefore be denied. (Doc. 98.) That motion is predicated on plaintiffs' view that the City has "failed to comply with core requirements of the consent decree." (Doc. 98 at 1.) But the evidence suggests otherwise. Indeed, the City has spent upwards of $4 million on sidewalk-improvement projects since the decree went into effect. (Doc. 87-1 at 2–3.) It has created a system to field public complaints about ADA violations and promptly address them. (Doc. 87-1 at 3–4). Of the 7,511 trip hazards identified by the Updated Transition Plan, the City had addressed 1,213 of them by the fourth quarter of fiscal year 2026. (D's Ex. 12.) The City has ensured that more than one employee is ADA-certified at any given time. It remains under contract with TWM—the third-party consultant—to inspect ADA-related work for compliance. (D's Ex. 10.) It has submitted to the Court annual reports detailing each of the hazards that have been addressed, along with whether they have been surveyed. (*See* Docs. 82, 94.) And, from a broader perspective, the City's 2025 Strategic Plan demonstrates that it has prioritized ADA compliance and accessibility in its budget decisions. As Dossey testified, the City's budget through 2031 commits substantial funds toward ADA remediation and thus compliance with the decree.

But the City's compliance with the decree (or lack thereof) is distinct from *when* the decree should be terminated. In their multiple filings since plaintiffs sought a termination date, the parties have offered "substantial compliance" as the appropriate standard to guide the Court's decision to terminate the decree. By contrast, the City's counsel suggested at the hearing that Rule 60(b)—which governs the modification of judgments—is the appropriate standard. On the City's view, the decree should be terminated if the Court finds that "a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). The Court disagrees on both fronts. Indeed, nothing in the decree suggests that it terminates upon a finding that the City has substantially complied with it. Nor would that make logical sense: A consent decree is a binding court order, so the City is *expected* to comply with it. Relieving the City of its obligation to comply with the decree simply because the City has complied with the decree is a non-starter. Substantial compliance is therefore not the relevant standard. Yet neither does *Rufo* control. That case speaks to the *modification* of consent decrees. *See id.* But establishing a termination date does not require the Court to modify the consent decree; the decree, as written, has an open-ended term and empowers the Court to set a termination date.

Instead, the Court turns to ordinary principles of contract interpretation. That is because "a judicially-approved consent decree, like a settlement agreement, is essentially a contract for purposes of construction." *McGee v. Illinois Dep't of Transp.*, No. 2-cv-277, 2002 WL 31478261, at *5 (N.D. Ill. Nov. 5, 2002). It follows that disputes

7

"regarding the scope of [a] consent decree" should be resolved by reference to "the plain language of the written agreement as the best expression of the parties' intent." *Id.* (quoting *United States v. City of Northlake*, 942 F.3d 1164, 1167 (7th Cir. 1991)).

The decree here simply grants the Court discretion to set a termination date; it does not establish a standard to guide the Court's exercise of that discretion. Several of the decree's other provisions, however, illuminate how long the parties originally intended it to last. To start, Section 2.2 provides that the decree "shall cover *all of the work required to be completed* as contained in the Updated Transition Plan." (Doc. 73-1 at 17.) The Updated Transition Plan, in turn, envisions a complete overhaul of the City's public infrastructure, encompassing 2.8 million square feet of sidewalk, 7,513 trip hazards, 700 obstructions, 2,211 ADA ramps, and 146 marked crosswalks. (Doc. 80-1 at 17.) If the decree is to remain in place until that work is completed, plaintiffs estimate that the decree would last for an additional 250 years—that is, as long into the future as the Declaration of Independence is behind us. (Doc. 92 at 2.) Of course, that cannot be the benchmark; it would eclipse even the most comprehensive consent decrees in the history of institutional reform litigation. *See, e.g.*, *Rufo*, 502 U.S. 367 (nineteen years); *Horne v. Flores*, 557 U.S. 433, 448 n.3 (2009) ("nearly a decade"). But at the very least, Section 2.2 suggests that the parties' contemplated the decree to be comprehensive and—by the same token—enduring.

Section 3.5 is also illuminating. It requires the City to "update the Updated Transition Plan every five (5) years, commencing on the fifth year after the completion of the Updated Transition Plan." (Doc. 73-1 at 20.) At a minimum, Section

8

3.5 suggests that the decree will last until 2029—five years after the City tendered the Updated Transition Plan to the Court. It also indicates that the parties may have intended the decree to last *several* five-year periods after the Updated Transition Plan was completed. This is consistent with Section 2.2, which envisions that the decree will cover a large majority of the City's progress towards complete ADA reform.

Likewise, Section 5.5 establishes a tiered scheme for monitoring the City's compliance. It also uses a five year interval, decreasing both the percentage of random checks that TWM must complete each year and the threshold that triggers a new inspection. Section 5.5 therefore confirms what Section 3.5 suggests: the consent decree was envisioned to last, at a minimum, until 2029. And Section 5.8 provides that the City could cure any noncompliance within two years, reinforcing the idea that the decree institutes a multi-year framework. That framework is bolstered by Section 10.3, which requires the City to file annual reports with the Court.

In isolation, none of these provisions conclusively answer when the decree should terminate. But collectively, they demonstrate that termination of the decree at this juncture would be inconsistent with the parties' intent and with the decree's spirit and purpose. The City's request to terminate the decree "as soon as reasonably possible" is therefore denied. (Doc. 87 at 5.) Although the Court finds that the City has honored the decree's material provisions, a great deal of remediation has yet to be done. The decree—a binding court order—provides the incentive necessary to ensure the City continues to make progress. And at the evidentiary hearing, the City's

counsel was asked whether the decree would impose a burden on the City, if it were to remain in effect. The City's counsel answered that it would not.

With all that said, the Court declines to set an arbitrary termination date now. True, the City has implemented meaningful ADA reform, and it has made progress towards remediating the ADA violations that precipitated this lawsuit. But the Updated Transition Plan has been in effect for only two years, and the plan envisions a comprehensive overhaul of the City's public rights of way. In their pre-hearing memorandum, plaintiffs "contend[ed] that no termination date should be established at this time." (Doc. 111 at 8.) The Court agrees.

Finally, plaintiffs have asked the Court to appoint an independent monitor to ensure the City complies with the decree. (Doc. 99.) Again, this request rests on the unsupported view that the City has failed to comply with its "core obligations" under the decree. Even so, the evidence at the hearing revealed that the City has maintained its contract with TWM—the independent firm designated by the parties and named in the decree. The evidence also showed that the City sends reports to TWM twice per year, who then performs inspections to ensure the City's upgrades are compliant. Plaintiffs' motion suggests that "TWM's contract expired in 2024," but the City's exhibits showed otherwise. Accordingly, TWM is already performing the role that plaintiffs envision for a court-appointed independent monitor. Appointing a *second* independent monitor would thus entail unnecessary time and expense. Indeed, plaintiffs' counsel conceded at the hearing that a court-appointed monitor

10

would be performing the same work as TWM. Plaintiffs' motion to appoint an independent monitor will therefore be denied.

The Court makes a final observation: At the hearing, plaintiffs' counsel stated that he has reached out to TWM, but to no avail. That is unacceptable. The decree expressly designates "Class Counsel" as a "Monitor" and provides that class counsel may "communicate directly with [TWM] to inquire as to the status and progress being made." (Doc. 73-1 at 34.) In response to these allegations, counsel for the City assured the Court that he would make all reasonable efforts to facilitate communication between plaintiffs' counsel and TWM. The Court will hold the City to that assurance.

## CONCLUSION

IT IS THEREFORE ORDERED that plaintiffs' Motion for Determination of Duration of Consent Decree, (Doc. 85), is GRANTED in part and DENIED in part, as explained in this Order. Plaintiffs' Motion to Enforce Consent Decree, (Doc. 98), and Motion for Appointment of an Independent Monitor, (Doc. 99), are DENIED. Plaintiffs' Motion to Grant as Unopposed and for Immediate Ruling on Plaintiffs' Motion for Appointment of an Independent Monitor, (Doc. 106), and Plaintiffs' Motion for Ruling on Plaintiffs' Motion to Enforce Consent Decree, (Doc. 107), are MOOT. The parties are encouraged to follow the conflict-resolution process outlined in Section 15 of the consent decree before seeking court intervention. Finally, the parties may apply to the Court for a termination date at a later time, but in no event earlier than April 23, 2029.

*So ordered.*

Entered this 10th day of August 2026.

s/ Ronald L. Hanna

Ronald L. Hanna
United States Magistrate Judge